A89A1369. LEHIGH PRESS, INC. et al. v. NATIONAL BANK OF GEORGIA.
A89A1370. ANATAR INVESTMENTS, INC. v. NATIONAL BANK OF GEORGIA.
(389 SE2d 376)

POPE, Judge.

This appeal involves the claims of three parties (National Bank of Georgia, hereinafter referred to as "NBG"; The Lehigh Press, Inc., hereinafter referred to as "Lehigh"; and Anatar Investments, Inc., hereinafter referred to as "Anatar") to certain funds which have been

paid into the registry of the Fulton County Superior Court.

The underlying facts are not in dispute. The entities named above each assert their rights to the funds because of various debts owing to them by Cable Coupon Associates, ("CCA") a Georgia Limited partnership, Cable Coupon Network, Inc. ("CCN") the general partner of CCA or Cable Ventures, Inc. (CVI), an affiliated corporation. From 1981 to 1983, CCA/CCN conducted an advertising service known as the Cable Cash Coupon Program. CCA/CCN had contracts with, inter alia, Bristol-Myers Products and Coca-Cola, USA, Inc., pursuant to which these companies agreed to participate in this program. It is the funds of these companies which have been paid into the registry of the trial court which are the subject of the present controversy.

In December 1981, Anatar, a venture capitalist, loaned CCA $225,000. In order to secure this debt, CCA and Anatar entered into a security agreement giving Anatar an interest in certain property of CCA. In January 1982 Anatar filed a UCC financing statement which purported to cover "All personal property, equipment and fixtures of whatever kind and description now owned by debtor or hereafter acquired."

Thereafter, NBG loaned $250,000 to CCA, CCN and CVI. This loan or "line of credit" was evidenced by a "Master Note" dated May 25, 1982. According to the deposition of Howard Mendel, Comptroller of CCN and a limited partner in CCA, CCA's agreement with NBG was such that it could borrow from NBG an amount equal to 80 percent of CCA's eligible receivables up to $250,000. As security for the loan, CCA & CCN executed a security agreement in favor of NBG, giving it a secured interest in, inter alia, all receivables of the parties. On June 15, 1982, NBG filed a UCC financing statement which covered "All accounts and contract rights of [CCA]." By letter dated June 21, 1982, Anatar agreed to "[subordinate] its interest in . . . [all accounts and accounts receivable] up to the amount of $250,000. relative to [CCA] to . . . [NBG]." On July 15, 1982, Anatar filed a UCC-1 statement evidencing the subordination agreement with CCA and NBG.

In September of 1982, Lehigh entered into an agreement with CCN whereby it agreed to manufacture and distribute coupon booklets for CCN. Lehigh sought assurance that it would be paid for the work done and the parties originally entered into an escrow agreement the terms of which are not pertinent here. However, the escrow agreement was eventually terminated and the parties sought another means to provide security to Lehigh. According to the Mendel deposition this situation was discussed with Lance Reising, an officer of NBG, and it was agreed that receivables over and above $250,000 could be used to secure Lehigh's interest. Specifically, it was agreed

that the Bristol-Myers and Coke accounts could be used for this purpose. Thereafter Mendel marked those accounts as "pledged" on the Receivables Aging Document, a document which was provided to NBG and which reflected the amount of receivables CCA/CCN had available to provide to NBG as security for credit extended to it.

CCA/CCN subsequently defaulted on its payment to Anatar, NBG and Lehigh. NBG brought suit against CCA, CCN, CVI, Bristol-Myers, Lehigh and Anatar asserting its right to the funds owing under the Bristol-Myers contract. Bristol-Myers filed a motion for judgment in the nature of interpleader. This motion was granted by the trial court and the funds remaining to be paid under the Bristol-Myers contract were paid into the registry of the court. Subsequently, pursuant to a consent agreement, Coke also paid the monies it owed under its contract into the registry of the court.

NBG filed a motion for summary judgment. Lehigh and Anatar responded to the motion and Lehigh filed a cross-motion. The trial court granted NBG's motion for summary judgment as to both parties and denied Lehigh's motion for summary judgment. Both Anatar and Lehigh have filed notices of appeal, which we have consolidated for review.

### Case No. A89A1370

1. Anatar contends that it agreed to subordinate its interest in the accounts receivable of CCA only for the first $250,000 loaned and since that amount was repaid, its subordination was not valid as to amounts subsequently loaned pursuant to the line of credit established by CCA with NBG. In this regard, the subordination agreement provides that "Anatar Investments hereby subordinates its interest . . . up to the *amount* of $250,000.00," and not, as Anatar contends, the *initial* $250,000 loaned under the line of credit.

Moreover, even if the subordination agreement did not secure the subsequent amounts loaned by NBG, we find that Anatar failed to perfect its security interest in the accounts receivable of CCA/CCN because it failed to include them in the collateral listed in its financing statement. As stated hereinabove, Anatar's financing statement, as well as its security agreement with CCA included "equipment" and "fixtures" but not accounts. See OCGA §§ 11-9-109 and 11-9-313, respectively. The question then is whether accounts or accounts receivable are encompassed by the phrase "all personal property," which is also used in the financing statement. OCGA § 11-9-402 (1) provides that "[a] financing statement is sufficient if it . . . contains a statement indicating the *types*, or describing the *items*, of collateral." (Emphasis supplied.) Although the description given in the financing statement, need not be specific, it must "reasonably identi[fy] what is described." OCGA § 11-9-110. We find that the phrase "all personal

property" "fails to indicate the *types* or describe the *items* of collateral in which a security interest was taken. . . . [The] failure to identify account as a type of collateral intended to be covered by the financing statement does not place third parties on notice that a security interest was taken in accounts receivable." *Healthcorp v. Southeastern Emergency Healthcare*, 85 Bankr. 170, 172 (Bankr. N.D. Ga. 1988). See also *In the Matter of Fuqua*, 330 FSupp. 1050, 1052 (D. Kan. 1971), 461 F2d 1186 (10th Cir. 1972).

Anatar urges, however, that NBG also failed to perfect its security interest in the accounts because the contracts of Bristol and Coke were with CCN not CCA and CCA was listed as the debtor on the financing statement filed by NBG. Firstly, the contracts show that the Bristol and Coke accounts were "accepted" on behalf of CCA. Moreover, even if the debtor should have been listed as CCN, not CCA, the trial court correctly concluded that this minor error in naming the debtor was not seriously misleading. "In [this case] subsequent creditors would be searching the indexes for a business debtor and a business was actually listed as the debtor. Also in [this case] the first [two names] of the business debtor [were] accurately listed so the inaccuracy did not result in a different indexing. . . . Inconsistencies in the remainder of the business entity listed would at least leave a prudent investor on notice that the business listed was the business debtor in question." *Citizens Bank v. Ansley*, 467 FSupp. 51, 54 (M.D. Ga. 1979). Thus we affirm the trial court's order insofar as it granted summary judgment to NBG against Anatar Investments, Inc.

### Case No. A89A1369

2. Lehigh argues that, contrary to the findings of the trial court it and not NBG was entitled to the funds paid into the registry of the court because the evidence shows that NBG agreed to subordinate its interest in the Bristol and Coke accounts in favor of Lehigh. The security agreement between NBG and CCA/CCN provides, in pertinent part that "[CCA] will not sell, transfer, lease, abandon, or otherwise dispose of . . . the collateral . . . except with the prior *written* consent of [NBG]." (Emphasis supplied.) The only "writing" here between CCA and NBG evidencing the "subordination" was the notation placed on the Receivables Aging Document showing the accounts in question as "pledged." Lehigh argues that NBG's failure to object to the document bearing this notation constituted an acceptance by NBG of the subordination agreement. As to this issue, NBG argues that the security agreement also provides that "no forebearance or indulgence shall operate as a waiver. . . ." Lehigh argues, however, that an anti-waiver provision such as the one at issue in this case can itself be waived, and that the question of waiver under these circum-

stances is for the jury to decide. See, e.g., *Smith v. Gen. Fin. Corp.*, 243 Ga. 500 (255 SE2d 14) (1979); *Integrated &c. Systems v. NEC Home Electronics*, 174 Ga. App. 197, 202 (329 SE2d 554) (1985).

Assuming arguendo that a jury question does exist as to the issue of waiver, we find the trial court's order granting summary judgment should nevertheless be upheld, because, as the trial court found, Lehigh also failed to perfect its security interest in the accounts. OCGA § 11-9-302 provides, in pertinent part, that "[a] financing statement must be filed to perfect all security interest except . . . (e) [a]n assignment of accounts which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts of the assignor." Here it is undisputed that the Coke and Bristol accounts accounted for 57 percent of CCA's accounts. Consequently, this constituted a significant portion of the accounts of the debtor and Lehigh, having failed to perfect its security interest in the accounts, cannot now assert priority over NBG's properly perfected security interest. See *Park Ave. Bank v. Bassford*, 232 Ga. 216, 218 (205 SE2d 861) (1974).

In sum, we find several bases for upholding the decision of the trial court as to each entity involved here. Consequently, the trial court's order granting summary judgment to NBG and denying Lehigh's motion for summary judgment is also affirmed.

*Judgments affirmed. Banke, P. J., and Sognier, J., concur.*

DECIDED NOVEMBER 29, 1989 —
REHEARING DENIED DECEMBER 14, 1989 —

*Hicks, Maloof & Campbell, Bruce M. Edenfield, Virginia B. Peterson*, for appellants (case no. A89A1369).

*Richard Freeman III, Gary G. Agnew*, for appellant (case no. A89A1370).

*Hurt, Richardson, Garner, Todd & Cadenhead, David W. Cranshaw, Glass, McCullough, Sherrill & Harrold, Robert S. Jones*, for appellee.

